### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

```
MARCIA H. FESZCHAK          :    Civil Action No. 06-0076(NLH)
and RICHARD FESZCHAK,       :
        Plaintiffs,         :
                            :
     v.                     :    OPINION
                            :
PAWTUCKET MUTUAL            :
INSURANCE COMPANY,          :
        Defendant.          :
```

**APPEARANCES:**

Kenneth R. Rothschild, Esquire
Golden Rothschild Spagnola Lundell Levitt & Boylan
1011 Route 22 West
Suite 300
PO Box 6881
Bridgewater, NJ 08807
     *Attorneys for Plaintiffs*

Marc L. Dembling, Esquire
Methfessel & Werbel PC
3 Ethel Road
P.O. Box 3012
Edison, NJ 08818
     *Attorney for Defendant*

**HILLMAN**, District Judge

This matter has come before the Court on the parties' cross-motions for summary judgment in this insurance coverage dispute. For the reasons expressed on the record at oral argument and below, Plaintiffs' motion will be granted, and Defendant's motion will be denied.

### BACKGROUND

Plaintiff, Marcia Feszchak, was injured when the handle bars of a stationary exercise bike she was riding at a physical

rehabilitation center, Optimum Medical Center ("Optimum"), suddenly fell forward.  Plaintiff filed suit against Optimum in state court, and Optimum tendered its defense to its business owner's liability insurer, Defendant Pawtucket Mutual Insurance Company.  Pawtucket refused to defend, citing the exclusion in their general business owner's liability policy for injuries resulting from professional liability.  Optimum defended itself, went to arbitration, and Plaintiff was awarded $350,000.  Instead of pursuing a trial de novo, Optimum settled with Plaintiff, and assigned its rights under its insurance policy to Plaintiff.

Plaintiff and her husband, Richard Feszchak, as assignees of Optimum, filed the instant action against Pawtucket, claiming that Pawtucket had a duty to defend because the professional liability exclusion does not apply.  Plaintiffs are also asking the Court to compel Pawtucket to pay the $350,000 settlement. The parties cross-moved for summary judgment.  Oral argument was held on the parties' motions.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

### B.  Analysis

There are two main issues before the Court: 1) Whether the professional services exclusion in the Pawtucket insurance policy applies to Plaintiff's injuries she sustained when she fell off the exercise bike, and, if so, 2) whether Defendant must pay the settlement amount.

### 1)  *Whether the professional services exclusion in the Pawtucket insurance policy applies to Plaintiff's injuries*

In New Jersey, insurance contracts are subject to special rules of interpretation because they are contracts of adhesion. Zacarias v. Allstate Ins. Co., 775 A.2d 1262, 1264 (N.J. 2001) (citations omitted).  When there is ambiguity, the insurance policy should be interpreted to "comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning." Id. (citations omitted).  Even in the absence of ambiguity, however, "[u]nder certain circumstances, . . . the plain meaning of policy language may be overcome if it conflicts with the reasonable expectations of the insured." Am. Motorists Ins. Co. v. L-C-A Sales Co., 713

3

A.2d 1007, 1013 (N.J. 1998) (citation omitted).

With regard to insurance policy exclusions, the New Jersey courts have held that they must be narrowly construed and that the burden is on the insurer to bring the case within the exclusion. Id. (citation omitted). "Nevertheless, [New Jersey courts] adhere to the principle that an insurance policy should generally be interpreted 'according to its plain and ordinary meaning,' so as not to disregard the 'clear import and intent' of a policy exclusion." Id. (citations omitted). If an insurance policy's terms are capable of supporting two distinct outcomes as to whether there is coverage, however, "the subject language must be interpreted in favor of the insured." Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switzerland, 170 A.2d 800, 803 (N.J. 1961). "Courts are bound to protect the insured to the full extent that any fair interpretation will allow." Id.

Here, the Pawtucket business owner's liability policy provided coverage to Optimum for "bodily injury," "property damage," "personal injury," "advertising injury," and "medical expenses" arising out of "[t]he ownership, maintenance or use of the premises . . . and operations necessary or incidental to those premises." (Pl.'s Ex. B.)  The Pawtucket insurance policy did not apply to certain professional services, however. The exclusion provided, in relevant part,

This insurance does not apply to: . . .

4

j.   Professional Services

"Bodily injury," "property damage," "personal injury"
or "advertising injury" due to rendering or failure to
render any professional service.  This includes but is
not limited to: . . .

(4)  Medical, surgical, dental, x-ray or nursing
services treatment, advice or instruction;

(5)  Any health or therapeutic service treatment,
advice or instruction . . . .

(Pl.'s Ex. B at 5.)

In order to determine whether this exclusion applies to the
situation here, the undisputed circumstances of Plaintiff's
injury must be considered.  On her second day of physical therapy
at Optimum for a partial tear of her Achilles tendon, after an
ultrasound and some exercises, the physical therapist, "Dipa,"
suggested that Plaintiff get on the exercise bike for further
physical therapy.  Plaintiff indicated that the seat was a little
high, but her feet were able to reach the pedals and Dipa did not
make any adjustments to the bike.  When Plaintiff started
pedaling, the seat was pitched forward and Plaintiff was
supporting herself by leaning forward on the bullhorn-shaped
handlebars.  As she was slowly pedaling for a while, the
handlebars suddenly rotated downward.  Plaintiff fell forward and
her foot slipped off the pedal and struck the floor.  Plaintiff
was taken to the hospital, and an MRI revealed a complete rupture
of the left Achilles tendon and a possible partial posterior
tibial tendon tear.

Plaintiff contends that Pawtucket had a duty to defend and indemnify Optimum because the exclusion in the insurance policy does not apply.  Plaintiff argues that her claim against Optimum was not one for medical malpractice or for its failure to provide professional services, but rather one for negligence for Optimum's failure to properly maintain the exercise bicycle located on its premises which was deemed to be in a defective and dangerous condition.  Plaintiff argues that her injuries arose out of the use of the premises, and the use of the exercise bicycle is an operation necessary or incidental to the premises run by Optimum.[1]

More specifically, Plaintiff contends that her action against Optimum was a negligence case arising out of the failure to maintain an exercise bicycle no different from exercise bicycles in any gym or health club.  Plaintiff argues that simply

_____

[1]Plaintiff notes that Defendant did not demand an Affidavit of Merit, which is required by New Jersey statute in cases arising out of professional negligence.  See N.J. Stat. Ann. 2A:53A-27, et seq.  Plaintiff argues that because Defendant did not demand an Affidavit of Merit, or move to dismiss for Plaintiff's failure to provide an Affidavit of Merit, it demonstrates that it is not a professional negligence case.  A failure to provide an affidavit of merit is a waivable defense, however, see Knorr v. Smeal, 836 A.2d 794, 798 (N.J. 2003). Moreover, Plaintiffs' argument proves too much.  Defendant's "failure" to demand an affidavit of merit is simply explained by the fact that Pawtucket did not write a professional liability policy.  An affidavit of merit is irrelevant when the policy at issue is one of general liability.  The record is clear that the Pawtucket policy excluded professional services and that Optimum was self-insured for such risks.  See Letter of Kenneth R. Rothschild, Esq. dated May 18, 2007.

because the bike was present in a rehabilitation office is merely incidental and coincidental and does not change the basic premise of the claim.  Plaintiff points out that the physical therapist made no adjustments to the bike, did not assist Plaintiff in getting onto the bike, did not adjust the feet or the handlebars of the bike prior to Plaintiff's accident, and did not instruct Plaintiff on how to ride the bike.  Further, while she was riding the bike, Dipa was sitting on a bench making notes.  Thus, Plaintiff argues that the accident was not the result of professional services rendered or failed to be rendered by Optimum, but a matter of equipment failure.

Plaintiff also notes that a "'professional' act or service within a malpractice policy is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor or skill and the labor or skill is predominantly mental or intellectual, rather than physical or manual . . . ." Atlantic Mut. Ins. Co. v. Continental Nat. Am. Ins. Co., 302 A.2d 177, 180 (N.J. Super. Ct. Law Div. 1973) (citing 7A Appleman, Insurance Law and Practice § 4504.3 (1972)).  Plaintiff argues that the maintenance of an exercise bike--i.e., making sure the handle bars will not suddenly flip downward--does not take any particular specialized knowledge or skill.  Consequently, considering that an insurance policy must be construed against the drafter, and when there are two conflicting interpretations

7

of a policy it must be interpreted in favor of the insured,
Plaintiff argues that the exclusion does not, and cannot, apply.

To the contrary, Defendant argues that the position of the
handlebars, the duration of time Plaintiff was on the bike, and
the rate of speed in which Plaintiff was riding, all required the
supervision of the physical therapist in her capacity as a
physical therapist.  Defendant argues that because Plaintiff was
at Optimum for physical therapy, her progress was being monitored
and noted by a physical therapist, and she was injured on the
bike during physical therapy, her injury arose out of a
professional service.  It is not as if, they argue, she had
slipped and fallen in the parking lot on the way into physical
therapy.  Thus, because Plaintiff's injury arose out of Optimum's
performance of professional services, Defendant argues the
insurance policy exclusion applies.

Recognizing that there is no analogous case in New Jersey,
Defendant relies heavily on two cases from other jurisdictions to
support its position.  In Antles v. The Aetna Casualty and Surety
Company, 221 Cal. App. 2d 438, 440 (Dist. Ct. App. 1963), a
chiropractor sued his insurance company under his general
liability policy for its refusal to defend him in a lawsuit by a
patient.  The lawsuit concerned treatments to the patient where
the chiropractor used "a thousand-watt infrared lamp that was on
'a pulley effect' at the outer end of a wall bracket which was

nailed to the wall at a place near the treatment table.  By means of the pulley, the lamp at the outer end of the bracket could be lowered or raised above the treatment table; and by means of a bracket swivel (presumably on the wall), the bracket could be swung back and forth above the table (to and from the wall)--that is, when the lamp was not in use it could be swung toward the wall and out of the way." <u>Id.</u>  The lamp and bracket had been installed in the office prior to the time the chiropractor purchased the office equipment in 1957 from a chiropractor who formerly practiced there.  <u>Id.</u>

The chiropractor's testimony revealed,

> Before applying the lamp heat . . ., it was necessary for him to make an adjustment of the lamp, that is, to swing the lamp out from the wall and raise or lower it to its proper height for treating [the patient], which height was about 6 feet above him. It was a radiating-type lamp which would burn a patient if he were under it for too long a period of time.  The use of the lamp involved a supervision problem for the doctor.  The adjustment of the height of the lamp from the patient, and the duration of time the patient stayed under the lamp, required the supervision of Dr. Antles in his capacity as a chiropractor.  The doctor adjusted the lamp in the manner above indicated, and proceeded to give the heat treatment.  It was his intention to have the patient on the table about 15 minutes for the treatment.  While the heat was being applied, the doctor remained in the treatment room and kept observing the "duration of time" of the treatment. After the patient had been undergoing the treatment for about five minutes, and while the doctor was standing at the sink washing his hands, he saw the bracket "just give away from the wall," come off the wall, and fall across the table; and the lamp hit and burned the patient's back.

<u>Id.</u>  The doctor testified further that after the accident he ascertained that the bracket had not been nailed to the studding of the wall, but had been nailed to the plaster.  <u>Id.</u>

The doctor argued that the act of affixing the bracket and lamp to the wall was a mechanical act and was not a professional service; that there was no evidence of the failure of any portion of the lamp which is moved or adjusted during the treatment; and that, on the contrary, the record indicates that the falling of the lamp was due to its becoming detached from the wall.  <u>Id.</u> The Court held,

> The lamp was the principal article or instrument used in giving the treatment, and preparatory to using it the doctor was required, in the exercise of his professional skill and judgment, to swing it from the wall to a proper place over the table and to adjust it to the proper height above the patient; and while the lamp heat was being applied, the doctor was required, in the further exercise of his professional skill and judgment, to observe the time during which the heat was applied, so that only the proper amount of heat for the specific treatment would be applied-and that a burn would not result from too much heat.  Also in the present case, the doctor remained in the room while the lamp heat was being applied.  As above stated, the doctor testified that the adjustment of the height of the lamp from the patient, and the matter of the length of time the patient stayed under the lamp, required his supervision in his capacity as a chiropractor. The finding of the trial court that the lamp was adjusted as a part of the doctor's professional services is supported by the evidence. It is apparent that the injury occurred during the performance of professional services.

<u>Id.</u> at 442-43.

Defendant also relies on Harris v. Fireman's Fund Indem. Co., 257 P.2d 221, 222 (Wash. 1953), which concerned a patient's declaratory judgment suit against her doctor's general liability insurer for its failure to pay for her injuries arising out of an incident where the osteopathic table on which she was lying collapsed while the doctor was administering treatment to her. There, the doctor instructed the plaintiff to lie on her back on a treatment table in his office in order to administer an osteopathic treatment. Harris, 257 P.2d at 223. The doctor instructed her to clasp her hands behind her neck with her elbows in front of her, and standing on the floor at her right side, he placed his right hand under her back, and with his left arm applied downward pressure in the region of her elbows, which treatment the doctor had applied on previous occasions. Id. During this treatment, the table collapsed.

The court held that the professional services exclusion in the doctor's general liability insurance applied, thus barring coverage to the plaintiff. The court explained,

> The findings of fact . . . show very plainly that the table being used by the osteopathic physician at the time it collapsed and injured the patient was no ordinary piece of office furniture. It was especially designed to enable an osteopathic physician to give his patients the type of treatment which he was licensed to give. It was as much a part of an osteopath's professional equipment as an operating table is part of a surgeon's professional equipment.
>
> The findings further state that the table was sold to [the doctor] as secondhand merchandise and that he knew

11

> before he placed [the patient] on the table for
> osteopathic manipulation that its safety catch was
> defective or by the exercise of reasonable care could
> have discovered such defect.  It is stated therein that
> this negligence was the proximate cause of the collapse
> of the table which caused [the patient's] injuries. . .
> . These allegations, in our opinion, are sufficient to
> show that [the patient's] injuries arose out of and
> resulted from malpractice, error, negligence or mistake
> committed by the doctor in the performance of his
> professional services as an osteopathic physician and
> thus the accident comes within the terms of the
> endorsement attached to the policy.

Id. at 224-25.

The Court finds that the issue of whether the professional
services exclusion applies presents a close call.  This is so, in
part, because the two cases cited above present facts very
similar to this case.  It is hard to distinguish between a heat
lamp that separates from the wall and a collapsing treatment
table from a collapsing exercise bike.  Ultimately, however,
these cases are unpersuasive here.

First, they are out-of-jurisdiction cases that do not
consider the tenets of New Jersey law concerning the
interpretation and application of insurance policies and
exclusions.  Second, they are factually distinguishable in
meaningful ways.  In Antles, the chiropractor actively used a
specialized device to treat his patient.  The chiropractor had to
determine the proper height of the lamp in order to apply the
proper heat for that particular patient, he had to adjust the
height of the lamp, and he had to determine the length of time

12

the patient stayed under the lamp, all of which required his supervision in his capacity as a chiropractor.  Harris also involved a specialized piece of equipment, on which the doctor performed his therapy on the patient.  Further, the doctor knew, or should have known, that the latch on the table was defective, which was the negligence giving rise to the patient's injury.

Here, Plaintiff rode a non-specialized piece of gym equipment; the physical therapist did not make any adjustments to the equipment; and the physical therapist did not perform any therapy services on Plaintiff while she was riding the bike. Although it does appear that the therapist had made some adjustments to the bike at some point prior to the therapy, the equipment did not function, as it did in Antles and Harris, as physical extensions of, or adjuncts to, the therapist's active work.

The Third Circuit case cited by Defendant is also not controlling here.  In Harad v. Aetna Cas. and Sur. Co., 839 F.2d 979, 984 (3d Cir. 1988), the Third Circuit applied Pennsylvania law to determine that the professional liability exclusion in a general liability policy precluded coverage for a suit against an attorney for malicious prosecution.  In doing so the Third Circuit recognized that there is duality to professional practices.  On one hand, the professional is a business owner with a commercial premises.  On the other hand, he or she

provides professional services that call upon one's mental and
intellectual skills.  For example, the court stated, if an
attorney's colleague tripped over a briefcase in the office, the
professional exclusion would not apply because an attorney's
liability for an action should be assessed depending on the
particular role he was performing at the time.  In the language
of the court, placing a briefcase on the floor is not a
"predominantly mental or intellectual [exercise], rather . . .
physical or manual."  Harad, 839 F.2d at 985.  Because the
defendant's role was to draft, sign and file a litigation filing,
in essence applying his intellect, the conduct was professional
in nature.  Id. at 984-85.

Harad does not compel the conclusion that the professional
services exclusion applies here.  If anything, it supports the
notion advanced by Plaintiff that the failure here was the
"manual" or "physical" failure to maintain equipment incidental
to an office for physical therapy.  In that regard, the harm
caused by Optimum's poorly maintained equipment is no different
than that caused by loose carpeting or a visitor's chair with a
broken leg.

The New Jersey cases cited by Defendant are also
unpersuasive.  In Records v. Aetna Life & Casualty Ins., 683 A.2d
834, 836 (N.J. Super. Ct. App. Div. 1996), a physician brought
suit against his medical malpractice insurer and homeowners'

14

insurer, seeking defense and indemnification in an underlying
personal injury action, in which a nurse alleged, among other
things, that she was a victim of a physician's assault and
battery.  The trial court held that the homeowners' policy did
not apply, but the medical malpractice insurance did.  The
appellate court affirmed.

In <u>Princeton v. Chunmaung</u>, 698 A.2d 9, 18 (N.J. 1997), the
New Jersey Supreme Court held that a doctor's medical malpractice
insurance covered a claim against the doctor for sexual assault
during a gynecological exam.  The court held that the policy's
language encompassed injuries caused by any act or failure to act
by the physician that occurred in the course of furnishing
professional services.

These cases do not help Defendant's position.  First, unlike
this case, <u>Records</u> involves the scope of a professional policy's
affirmative coverage, not an exclusion in a general policy.  More
specifically, the issue was whether the assault at issue, while
not the direct "rendering of professional services," could be
said to fairly "arise out of" such services.  The court did not
analyze the exclusion in the doctor's homeowner's policy, other
than to state that because it already determined that the
incident arose out of the rendering of professional services, and
that the language of the homeowner's exclusion was almost
identical to the language in the malpractice policy, the lower

15

court properly excluded coverage under the homeowner's policy. In that sense, Records merely stands for the general proposition that in New Jersey disputes over coverage are ordinarily resolved in favor of the insured. Records, 683 A.3d at 838 (in case of first impression adopting view of other jurisdictions that malpractice policies should be liberally construed to extend coverage to various kinds of claims including ones by non-patients). Similarly, Princeton focused on whether the doctor's malpractice policy provided coverage for his alleged sexual assault on a patient, and it did not discuss a general business owner's liability policy exclusion.

Here, when applying long-established New Jersey law on the interpretation of insurance contracts, the Court is compelled to conclude that the exclusion does not apply to Plaintiff's injury. First, with regard to the interpretation of the language of the exclusion, the business owner's liability insurance policy excludes coverage for bodily injury "due to rendering" of any professional service. As Defendant contends, it would be a fair and reasonable interpretation of the policy to hold that "due to" the physical therapist's professional judgment that Plaintiff should ride the exercise bike as part of her therapy--i.e., the instruction to ride the bike was a rendering of professional service--Plaintiff sustained injury because of the rendering of that professional service. It would also be a fair and

16

reasonable interpretation of the policy, however, to hold that Plaintiff's injury was not "due to" the rendering of any professional service, but instead "due to" a defective bicycle. In New Jersey, if an insurance policy's terms are capable of supporting two distinct outcomes as to whether there is coverage, the subject language must be interpreted in favor of the insured. Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992).

Also in New Jersey, insurance policy exclusions must be narrowly construed, and the burden is on the insurer to bring the case within the exclusion. Defendant has not met its burden to bring this case within the exclusion. Defendant has not shown that in a situation such as this--where a standard, non-specialized and unadjusted piece of gym equipment malfunctioned--courts have found Defendant's interpretation of the exclusion more compelling than Plaintiff's.

Defendant also makes the argument that but for the physical therapist's instruction to Plaintiff to ride the bicycle, she would not have been injured. That argument can be extended infinitely, however. For example, but for Plaintiff's need for physical therapy, she would not have walked on the slippery parking lot and fell; but for Plaintiff's need for physical therapy, she would not have driven to the rehabilitation center and gotten into an accident on the way. Thus, this argument is unavailing.

Finally, the New Jersey courts have long held that insurance contracts are to be interpreted to comport with the reasonable expectations of the insured.  It is a reasonable expectation that Optimum purchased a general business owner's liability policy that would protect against injuries arising from the malfunctioning of its business equipment, as opposed to the failure of its therapists' professional judgment.  Consequently, because insurance contracts are construed against the drafter and in favor of the reasonable expectation of the insured, and because the exclusion can be interpreted in two distinct ways, the exclusion in Optimum's business owner's liability insurance does not apply to Plaintiff's injury.

### 2) *Whether Defendant must pay the settlement*

Because the Court has found that the business owner's liability policy exclusion does not apply, and Defendant had a duty to indemnify its insured, it must be determined whether Defendant is liable for the settlement entered into by Plaintiffs and Optimum.  The New Jersey Supreme Court has directed that a court must conduct an independent review of a settlement and apply a burden shifting analysis in order to determine whether the settlement was reasonable and/or entered into in good faith.  Griggs v. Bertram, 443 A.2d 163 (N.J. 1982).  The insured has the initial burden of production establishing the facts surrounding the settlement, but the insurer has the ultimate burden of

18

persuasion because the insured's rights derive from a contract of adhesion, which the insurer, as the dominant party, must honor as a fiduciary.  <u>Griggs</u>, 443 A.2d at 173.  The court explained,

> By imposing upon the insured the burden of production or going forward with relevant evidence, a settlement which the insured has not shown by the initial production of proof to be prima facie reasonable in amount and untainted by bad faith would, of course be unenforceable.  Since, however, the insurer by its unfair dealing has imposed upon the insured the full burden of protecting its own interests and has placed it in the difficult predicament of attempting on its own to secure the benefits of insurance under the policy, the insurer should not be freed of the burden of persuasion on the question of its ultimate responsibility to pay.  It should, therefore, be required to sustain the ultimate and major burden of demonstrating, by a preponderance of the evidence, that it is not liable because the settlement is neither reasonable nor reached in good faith.

<u>Id.</u>

In their papers, Plaintiffs explained the circumstances of the settlement.  Two years after she filed suit in state court against Optimum, Plaintiffs accepted a settlement of $350,000, which is the same value that was assessed by a neutral arbitrator following mandatory, non-biding arbitration.  Optimum agreed to assign and convey any and all of its claims it may have had under their business owner's insurance policy to Plaintiffs.  In consideration of this agreement, Plaintiffs agreed not to execute the consent judgment that was entered against Optimum.

The settlement was placed on the record before a state court

19

judge, who stated on the record that even though a trial de novo

was requested by Optimum,

> I understand that a settlement has been reached in this
> case in the same amount [as the arbitration award] now,
> in part, because the parties do not wish to incur
> expenses of a trial and take chances on the jury
> reaching either a higher or lower verdict than the
> arbitration amount.
>
> The permanency of the injury, the inability to work,
> the medical expenses and the loss of income considered,
> the parties are not unreasonable in reaching this
> settlement, and the Court will approve it, of course,
> indicating that it doesn't find anything unreasonable
> about the settlement that the parties have entered into
> today.
>
> The Court is not making its own factual finding with
> respect to the injuries.  It hasn't heard sufficient
> testimony on that, and this is not in the nature of a
> proof hearing and this is not an original award of the
> Court.  But, instead, it is a finding by the Court that
> the settlement of the parties is not unreasonable under
> the circumstances presented by the evidence in this
> case.

(Pl.'s Br. at 23-24 citing Exhibit K.)  Based on the foregoing,

Plaintiffs contend that the settlement was reasonable and made in

good faith.

Defendants argue, however, that the settlement was a product

of collusion and it was not reasonable.  To prove their position,

Defendant hired as an "expert" Carl Greenberg, Esquire, who

stated he has over forty years of experience and practice as a

personal injury tort attorney.  Based on a review of the state

court filings, transcripts and medical records, Greenberg opined

that the settlement amount was not reasonable, and that it was

not entered into in good faith.

Plaintiff challenges the use of the "expert," arguing that it is an inadmissible net opinion, not based on the entire record, and mere conjecture.  Plaintiff also argues that it is the Court that must determine the reasonableness of the settlement, and it is not the function of an expert witness.

A thorough review of the evidence before the Court reveals that Plaintiffs have met their burden of production that their settlement was reasonable in amount and untainted by bad faith, while Defendant has failed to meet its burden of persuasion to prove otherwise.

As an initial matter, it is undisputed that the amount of the settlement equaled the exact amount awarded by the court-mandated arbitrator.  No allegation is made that the arbitrator was anything other than what the name implies--someone not beholden to or improperly swayed by either party.  The fact that the settlement amount mirrored the arbitration award clearly influenced Judge Ashrafi.  Although Judge Ashrafi did not go so far as to rule the settlement "reasonable," at least in so many words, the words he did choose suggest he had no reason to doubt the reasonableness of an award entered by a neutral arbiter. This Court finds itself in the same position as Judge Ashrafi.

Second, there is nothing in the procedural history that suggests the arbitration award was a product of collusion.  The arbitration itself was mandatory by court rule and no claim has been raised questioning the method for the selection of the arbitrator.  Optimum, for its part, sought a trial de novo resulting in litigation expenses for both sides, which is hardly an act of collusion.

Finally, it would seem contrary to the whole notion of non-binding arbitration to suggest such proceedings provide no guideposts for the just, efficient, and cost-effective resolution of disputes.

Nothing in the expert reports submitted by the defense causes the Court to reach a different result.  Reduced to their core, the reports conclude that Optimum was insufficiently aggressive at attacking Plaintiffs' damage theories or otherwise litigating the case.  Extensive depositions and motion practice, however, while commonplace and appropriate, cost money.  This Court can not say that it was unreasonable for Optimum, abandoned by its insurer, to have focused its resources on the arbitration and a settlement Judge Ashrafi expressly considered consistent with Plaintiffs' injuries and other damages.  It is surely ironic, and ultimately unpersuasive, for Defendant to hire an expert at $400 an hour to critique Optimum for not waging a war it was unwilling to fight itself.  Perhaps if that money had been

22

spent earlier in Optimum's defense, the result would have been different.  But that argument is as Plaintiffs suggest, merely conjecture.  It is not, standing alone, any proof that the process between Optimum and Plaintiffs was anything other than adversarial.  Consequently, Defendant is liable for the settlement entered into by Plaintiffs and Optimum.

## CONCLUSION

For the reasons expressed above, Plaintiffs are entitled to judgment in their favor on their claims against Defendant. Plaintiffs are instructed to submit for the Court's review a proposed order of judgment.  An appropriate Order with regard to the parties' summary judgment motions will be entered.


Dated: April 8, 2008                    s/ Noel L. Hillman

At Camden, New Jersey                   NOEL L. HILLMAN, U.S.D.J.

23